952 So.2d 950 (2006)
Robert H. WILLIAMS and Any Unknown Heirs-at-Law of Travis and Florence Williams, Appellants
v.
The ESTATE OF John Horace WILLIAMS, Deceased, by Gloria FAIRLEY, Executrix, Appellee.
No. 2005-CA-00601-COA.
Court of Appeals of Mississippi.
September 5, 2006.
Rehearing Denied January 30, 2007.
*952 William W. Dreher, Jr., Gulfport, attorney for appellant.
Tadd Parsons, Wiggins, Jack Parsons, attorneys for appellee.
Before KING, C.J., GRIFFIS and BARNES, JJ.
GRIFFIS, J., for the Court.
¶ 1. The Estate of John Horace Williams, represented by the executrix Gloria Fairley, filed suit against Robert H. Williams and the unknown heirs of Travis and Florence Williams to confirm title to certain real property in Stone County. Robert filed a counterclaim to quiet and confirm an undivided interest in title in himself. The chancellor ruled that John had adversely possessed the property since 1960 and confirmed title in the Estate. We find no error and affirm.

FACTS
¶ 2. In 1895, Travis and Florence Williams purchased a certain parcel of land in what is now known as Wiggins, Stone County, Mississippi. Travis died intestate in 1935, and Florence died intestate in 1960. The land, consisting of fifty-one acres, went to their nine children as tenants in common. These children were R.T. Williams, Petral Williams, Evert Williams Bullock, Flora Williams Johnson, John Horace "Preacher" Williams, Tommy Williams, Kizer Williams, Louis Charles Williams, and Rachel Williams Fairley. The appellant Robert Williams is Kizer's son, and the estate's executrix Gloria Fairley is Rachel's daughter.
¶ 3. In 1966, John returned home from the military and moved onto the property. From that time on, he insisted that anyone, including his family, who wanted to visit or use the property get permission from him first. The prevailing belief in the community was that the property belonged to John. Although his sister Rachel and her children lived in the house with John, it was only through his permission. Gloria returned to the home in 1982 to take care of her sick, elderly mother and uncle. John's daughter Jenice Williams Clendening lived in the house as well. John was in charge of all maintenance and improvements to the land. Kizer and another brother helped around the property, such as repairing the roof. However, John always paid them for their work. John's brothers and sisters referred to the land as John's. On a few occasions, John asked his brothers to leave the property, and they did.
¶ 4. During 1994 through 1995, John obtained deeds from two of Flora's children and two of Rachel's children which purported to give him their interest in the land. The deeds stated, however, that they already recognized John as the sole, exclusive owner of the property. From 1997 to 1999, Robert obtained deeds from R.T., Petral, and all five of his own sisters which purported to give their interest in the property to him. On March 29, 2001, shortly before his death, John deeded 1/32 of his interest in the property to Gloria.
¶ 5. The only time that a family member's animals went on the land without John's permission was when Robert placed them there. However, he did not do this until 2001, when John became hospitalized and confined to a wheelchair. When John returned home and found out, he was so *953 angered that he threatened to shoot the cows and Robert. Gloria's son Derrick Fairley hid John's guns to keep John from killing Robert and his animals.
¶ 6. John died later that year. The beneficiaries of his will include Jenice, Gloria, and Derrick. On November 8, 2002, John's estate filed suit against Robert and Travis's and Florence's estates to declare John's estate as the sole owner of the property. On September 9, 2003, Robert petitioned to have Travis and Florence's estates opened and to determine heirs. He listed the subject property as the only asset of their estates. The cases were consolidated. After a two-day trial, the chancellor found that John adversely possessed the property from his co-tenants; therefore, his estate was the sole owner of the property.

STANDARD OF REVIEW
¶ 7. The question of whether adverse possession was proven by clear and convincing evidence is a factual determination made by the chancellor. Bacot v. Duby, 724 So.2d 410, 419(¶ 44) (Miss.Ct. App.1998). A chancellor's findings of fact will not be disturbed unless manifestly wrong or clearly erroneous. Sanderson v. Sanderson, 824 So.2d 623, 625(¶ 8) (Miss. 2002). This Court will not disturb the findings of a chancellor when supported by substantial credible evidence unless the chancellor abused his or her discretion, was manifestly wrong, clearly erroneous, or an erroneous legal standard was applied. Id. at 625-26(¶ 8). Legal questions are reviewed de novo. Russell v. Performance Toyota, Inc., 826 So.2d 719, 721(¶ 5) (Miss.2002).

ANALYSIS
¶ 8. Robert asserts that the chancellor erred in finding that John adversely possessed the land. As the party who claimed adverse possession, John's estate bore the burden of proving it by clear and convincing evidence. Bacot, 724 So.2d at 419(¶ 46). John's estate had to prove that his possession or occupancy of the property was (1) under claim of ownership, (2) actual or hostile, (3) open, notorious, and visible, (4) continuous and uninterrupted for ten years, (5) exclusive, and (6) peaceful. Id. There is an additional element in order to adversely possess the interests of co-tenants. Id. at 419(¶ 47). His estate must also prove ouster. Jordon v. Warren, 602 So.2d 809, 814-15 (Miss.1992). Ouster is unequivocal notice by one cotenant that he intends to adversely possess the claims of his fellow co-tenants. Id. at 815. Robert contends that John's estate failed on three elements: exclusivity, hostility, and ouster. John's estate responds that there was substantial credible evidence to support the chancellor's finding of adverse possession.
I. Was there substantial, credible evidence that John's possession was exclusive?
II. Was there substantial, credible evidence that John's possession was hostile?
¶ 9. The chancellor found that Robert admitted that John's possession of the property was both exclusive and hostile when Robert failed to respond to the requests for admissions served by John's estate. The chancellor also found the evidence at trial supported these admissions.
¶ 10. Rule 36(a) of the Mississippi Rules of Civil Procedure provides that where a party does not respond to requests for admission within thirty days, the requests are deemed admitted. The admission conclusively establishes the matter for the pending litigation unless the trial judge allows withdrawal or amendment. M.R.C.P. 36. The chancellor held *954 a hearing on whether to deem the requests admitted. John's estate served Robert with the requests on November 11, 2002. By February 14, 2003, there was still no response. John's estate moved for summary judgment on the basis of the admissions. The chancellor deemed the requests admitted, but found they did not establish ouster or a definite time period as to when the adverse possession began to run. Robert does not challenge the chancellor's actions with regard to the admissions. Indeed, pursuant to Rule 36(a), these requests were deemed admitted unless the chancellor permitted amendment or withdrawal. Id. The rule is enforced according to its terms. Martin v. Simmons, 571 So.2d 254, 256 (Miss.1990).
¶ 11. By virtue of admitting the matters included in the requests for admissions, Robert admitted the following:

REQUEST NO. 1: . . . John H. Williams had exclusive use, possession and control of the property in question and used it as his own from the mid-'50's until his death.

REQUEST NO. 4: . . . John H. Williams held out to the public the property in question was his own and had exclusive use, possession and control of the property in question since his retirement out of service until his death.

REQUEST NO. 5: . . . John H. Williams never permitted anyone else to use the property except himself after the death of his mother.

REQUEST NO. 6: . . . John H. Williams required all of the brothers and sisters and their heirs to remain off the property as long as he lived.

REQUEST NO. 11: . . . John H. Williams would never permit any other persons, even their heirs, or cattle or horses on the pastures.
Exclusive use was expressly admitted. As for hostility, it means "an assertion of title superior to the potential competing claims of anyone else; it can be rebutted by showing that the actual record title owner gave permission to begin the possession." Lynn v. Soterra, Inc., 802 So.2d 162, 166(¶ 14) (Miss.Ct.App.2001). By virtue of the admissions, Robert conceded that John asserted that he had a superior title to the land than that of his co-tenants.
¶ 12. It was then Robert's burden to prove that John's possession began permissively, in order to rebut Robert's own admission that it was hostile. Id. at 167(¶ 14). The evidence at trial of permissive use was the testimony of Robert's witness Lovelt Fairley, who testified, "They let [John] control it." Lovelt was unclear whether this permission came at the beginning of John's possession or after years of fighting with his siblings over the land. Later he said that to his personal knowledge none of the co-tenants objected to John living on the property. Lovelt left for the military in 1960 and returned in 1966 to the community. It is unclear whether he was present before or after John began possession in 1966. Robert likewise testified that he never saw an heir object to John living on the property. However, he conceded he did not grow up with his family, and had no knowledge of or interest in the property until Kizer died in 1992. Robert subsequently stated that he did not know how the co-tenants felt about John controlling the property.
¶ 13. There was testimony from Robert's sister Elva Joyce Husband that around 1965, Kizer objected to John being on the land. This, coupled with Gloria's testimony and Robert's admissions, indicated that the siblings, most notably Kizer, were fighting with John over the land before he came into possession of it. This was substantial credible evidence for the *955 chancellor to conclude that Robert did not carry his burden of rebutting the prima facie case of hostility. If anything, he produced conflicting evidence as to whether John's use was permissive. This issue has no merit.
III. Was there substantial, credible evidence that John unequivocally ousted his co-tenants?
¶ 14. Next, we examine Robert's argument that there was no evidence of ouster. The chancellor found John ousted his siblings by unequivocal actual notice since 1960. "An ouster of a co-tenant not in possession must be unequivocal notice of some kind to the co-tenant not in possession that the one in possession intends to hold and claim ownership of the property to the exclusion of all others." Jordon, 602 So.2d at 815. It must be distinctly hostile to the rights of the others so that the intent to adversely possess is clear and unmistakable. Id. The co-tenant alleging ouster has the burden to prove that the others were "unequivocally ousted by actual notice or conduct equivalent thereto." Id.
¶ 15. For example, in Mosley v. Clark, 362 So.2d 615, 616 (Miss.1978), H.H. Lafferty died intestate in 1947, leaving 177 acres to his children as tenants in common. Two of these children were Fossie Clark and Alfred Mosley. Id. They were the only co-tenants who claimed an interest in the property. Id. The court affirmed the lower court's finding that Clark adversely possessed seventy-four acres of the land away from her sibling co-tenants. Id. at 617. Mosley admitted he knew Clark and her husband were claiming the seventy-four acres as their own since 1937. Id. He also testified the seventy-four-acre tract was known in the community as the "Clark Place." Id. The court held this established actual notice of Clark's claim to possess the land exclusively and not as a tenant in common. Id.
¶ 16. The evidence in this case is similar to that in Mosley. In particular, Archie Batson testified that he was a long-time neighbor and family friend of the Williamses. He was familiar with the family and the land in question since the early 1950s. All of his life, Archie was under the impression it was John's property. He said the prevailing belief in the community was that the fifty-one acres belonged to only John. He testified that John was mean and even required his siblings to get his permission to go on or use the property. He testified that the siblings did not dare go on the property without getting John's permission. He said he never witnessed John physically evict his siblings from the land. Batson stated that from the 1950s until the present litigation, he never heard anyone in John's family claim an interest in the land. Batson testified that the Williams family, including R.T. and Kizer, referred to the land as "John's place."
¶ 17. Derrick, who next testified, said he had lived on the property with John since he was born. Derrick maintained that for the first twenty-nine years of his life, there was no other belief in the family but that the property was John's. At trial in 2004, Derrick was thirty-nine years old. Derrick additionally corroborated Batson's testimony that family members had to get John's permission to come onto the property. If the family did not ask permission first, they were asked to leave. When the family members were asked to leave, they did. Derrick testified that although he and Kizer made improvements to the land, they did so at John's request and were compensated by him. No other family member placed animals on the land with the exception of Robert. However, he did not do this until 2001, when John was *956 bound to a wheelchair. Once John found out, he threatened to kill Robert and his animals. The only family who ever lived with John were Jenice, Rachel, Gloria, Derrick, and Rachel's other children. Jenice was John's daughter. As for the rest, Derrick said it was only through John's permission, and if they had been asked to leave they would have to do so.
¶ 18. Maurice Redeemer testified that he came into the family thirty years ago when he married Joanna Fairley Redeemer, one of Rachel's daughters. He lives down the road from the property in question and worked for John for the last twenty years of his life. He has lived in the community since 1964 and testified that the prevailing belief was that the property was John's. He never heard John's co-tenants, including Joanna, claim an interest. He testified that all John's co-tenants knew that John claimed the land for himself.
¶ 19. Voncile Martin testified that she has been a friend of the Williams family since 1956. John returned home from the service in the early 1960s. She testified that the community had always believed it was John's property. She verified that he was mean and would not let his co-tenants go on the property without his permission. She said the heirs refer to the farm as John's place.
¶ 20. Gloria testified she was raised in the house with her mother. She married and left, but returned in 1982 to take care of her mother, who died in 1994. She and Derrick remained to take care of John. Gloria asserted that John's siblings "knew they could not come there to do anything." She said he had no hesitancy in telling his siblings that he owned the property from the time the present house was built[1] until his death in 2001. He told them and her repeatedly that he was the sole owner. Gloria said this occurred continuously, as long as she can remember. She said he did not allow any of his siblings "to build anything or tear down or remove anything on or from that property." She testified that the 1995 deeds from some of the heirs which purported to give their interest to John was done at an attorney's suggestion. She said those heirs were surprised, because they believed that John was already the sole owner of the property. Nevertheless they signed the deeds at his request with no compensation. The deeds recite that they recognize that John is the sole owner.
¶ 21. Lovelt testified that Augustine and Evelyn Bullock (two of Evert's children), Johnny and Willie Johnson (two of Flora's children), and his brother Beotis Fairley demanded their "heir share" from John, but John refused. He admitted that the property was referred to by the family as "John H. Williams'[s] estate."
¶ 22. Robert testified that no heirs sought permission to use the land, but he never would answer whether or not John told them they had to get permission. Elva testified that relatives used the land without permission, but this was prior to 1968. She further testified that she had no personal knowledge of anything that transpired between John and his siblings.
¶ 23. On this record, we find that there is substantial credible evidence to support the chancellor's findings of ouster. Every one of John's co-tenants had actual, unequivocal notice that John was asserting exclusive title and he would not recognize their rights as co-tenants. There was evidence that this occurred as early as Florence's *957 death in 1960 and as late as John's retirement in 1966. His exclusive possession continued uninterrupted until 2001. Accordingly, we affirm the chancellor's judgment.
¶ 24. THE JUDGMENT OF THE CHANCERY COURT OF STONE COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.
KING, C.J., LEE AND MYERS, P.JJ., SOUTHWICK, IRVING, CHANDLER, BARNES, ISHEE AND ROBERTS, JJ., CONCUR.
NOTES
[1] The record is unclear as to when the house was built. It shows only that was before John retired from the military in 1966.