# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2019-CA-01773-COA

**ROSIE ANDERSON AND CHARLES WHITE** APPELLANTS

**v.**

**MARION O'NEAL BROWN JACKSON, AS ADMINISTRATRIX OF THE ESTATE OF LEVON JACKSON LAWSON, SHIMEKA JACKSON, TERRY BUTLER, AND LEVON JACKSON, JR.** APPELLEES

| | |
|---|---|
| DATE OF JUDGMENT: | 10/17/2019 |
| TRIAL JUDGE: | HON. CATHERINE FARRIS-CARTER |
| COURT FROM WHICH APPEALED: | BOLIVAR COUNTY CHANCERY COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEYS FOR APPELLANTS: | BERNARD C. JONES JR. ASHLEY D. JONES |
| ATTORNEY FOR APPELLEES: | JOHN MARSHALL ALEXANDER |
| NATURE OF THE CASE: | CIVIL - REAL PROPERTY |
| DISPOSITION: | REVERSED AND RENDERED - 04/26/2022 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE CARLTON, P.J., GREENLEE AND McDONALD, JJ.**

**McDONALD, J., FOR THE COURT:**

¶1. Rosie Anderson ("Anderson"), the daughter and then-attorney-in-fact for Rosie Lawson ("Rosie"), and Charles White (Rosie's son) appeal from an October 17, 2019 Bolivar County Chancery Court's judgment confirming Levon Jackson Lawson's title to fourteen acres of inherited property. After a trial on the matter, Levon died on October 20, 2019, and his estate was substituted as a party (hereinafter at times referred to as "Levon"). Anderson and Charles (collectively referred to at times as "Anderson") challenge the chancery court's

findings that Levon had met the requirements of adverse possession and also secured a valid tax title. They also claim the chancery court erred in finding that Rosie was guilty of "unclean hands" and that she lacked standing to contest the validity of a default judgment rendered against other heirs. Having reviewed the facts, relevant precedent, and arguments of counsel, we reverse the chancery court's findings that Levon had obtained title by adverse possession or by tax title and its finding that Rosie had "unclean hands," and we render judgment as stated below.

**Facts**

¶2. Prior to his death on December 9, 1977, Andrew Lawson owned two parcels of property in Bolivar County, totaling approximately fourteen acres combined (11.0494 acres in Tract 1 and 3.4087 acres in Tract 2). After his death, contentious litigation arose concerning the validity of a purported will by Andrew that would have given the entire property to Andrew's second alleged common law wife, Annie Mae Lawson, who was Levon's mother, to the exclusion of other heirs at law. The Bolivar County Chancery Court administering Andrew's estate ultimately denied probate of the will and adjudicated Andrew's heirs to be his widow Georgia; his surviving children James, Rosie, and Levon; and his grandchildren (children of two deceased children) Loretta Lawson, Linda Kay Lawson, Sandra Kay Lawson, William Johnson, and Frenchy Johnson Jr.

¶3. After Andrew's death and the chancery court's order in the estate proceedings, Rosie paid the taxes on the property even though she lived in Illinois. The tax assessor's records

2

reflected that the property was owned by "Lawson Andrew," and notices were sent to "Lawson Andrew c/o Rosie Lawson" in Decatur, Illinois. Years later, Rosie and Levon discussed the property, and Levon began paying the taxes on the property sometime around 2000. Thereafter, tax notices were sent to "Lawson Andrew c/o Levon Jackson."

¶4. In 2012, Levon failed to pay the 2011 property taxes, which became delinquent on February 1, 2012. Levon then purchased the property at the 2012 tax sale held on April 2, 2012.[1] At the time of the tax sale, "Lawson Andrew c/o Levon Jackson" was listed as the record owner of the property.

¶5. Two years later, the Bolivar County Chancery Clerk sent notice of the expiration of the redemption period ("Notice of Forfeiture to Land Owners") only to the property owner, "Lawson Andrew in care of Levon Jackson." The chancery clerk's April 17, 2014 affidavit indicated that the notice was sent certified mail to "Lawson Andrew c/o Levon Jackson" and signed for by "Levon Jackson." The affidavit further indicated that notice was served by the sheriff on "Levon Jackson" and published in the newspaper on March 2, 2014. The clerk's affidavit notes the following under "Contacts made":

> Levon Jackson has been paying taxes for several years.
>
> 3/4 - talked to Rev. Willie Jackson - only Levon's mother Annie have (sic) interest in property - mother would want Levon to acquire so they will not pay.[2]

---

[1] There is no testimony in the record concerning the procedures followed by the tax collector in conducting the April 2, 2012 tax sale.

[2] The record contains no information concerning the identity of Rev. Willie Jackson.

3

When no redemption was made, the chancery clerk issued a tax title to Levon on May 6, 2014.

¶6. On January 10, 2018, Levon filed suit in the Bolivar County Chancery Court seeking to confirm the tax title to the property. He also claimed title to the property by adverse possession. Levon's complaint named each of Andrew's heirs at law, as well as heirs of deceased heirs and the State of Mississippi as defendants. Levon served the non-resident parties by publication of notice of the lawsuit in the *Bolivar Commercial* newspaper on January 15, 22, 29, and February 5, 2018. The clerk issued Rule 4 summonses, M.R.C.P. 4, and mailed them by certified mail to individuals for whom addresses were provided, including Grace L.D.L. Austin, Bertha Lawson Ray, Viola Lawson White, Captain L. Lawson Jr., Andrew Lawson, Karen Hardy Lawson, Sandra Kay Lawson, and Rose Lee Lawson. The summonses did not contain a specific day or time for hearing on the matter—only that the defendants had thirty days from receipt to file an answer. Green cards showing receipt of the certified mailings were filed for Viola Lawson White, Rosie Lawson, Captain Lawson, and Sandra Kay Lawson.

¶7. The State of Mississippi answered the complaint on February 20, 2018, indicating that it could not deny Levon's allegations. An attorney for Rosie contacted Levon's attorney and asked for additional time to answer. On February 26, 2018, more than thirty days after publication and delivery of the summonses by certified mail, Levon sought and obtained a clerk's entry of default against all other defendants except the State and Rosie.

¶8. On March 9, 2018, the chancery court convened a hearing on Levon's complaint. He testified to his use of the land, saying that he farmed the land for twenty-five years after his father died until Levon's own health started to fail. Although Levon gave no specific date when he started his own farming, he said he was currently farming and had started when he retired. He did not testify to the date of his retirement. He told the court that no one from the family had farmed the land, but neighboring farmers had farmed it: "like this was their land right here . . . they was farming all over here." Levon said, "That was another reason for us to get the title clear because if something happens to me, no one would know where the lines were." So he had a survey done on January 23, 2014.

¶9. Levon further testified that he started to gather the names and addresses of family members by going to reunions and funerals. He entered a list of forty-one individuals he claimed were heirs of Andrew Lawson and said he sent summons to each by certified mail.[3] Levon also testified:

> Q. All right. Now, Mr. Jackson, I want you to tell the Court everything you did to locate all of the heirs of Andrew Lawson.
>
> A. Okay. We -- I communicated with other family members. And through word of mouth, they agreed that for me to continue.
>
> And through family reunions, through death and family, I have had to speak at the eulogy of some of the family members. They agreed for me to continue, but I didn't know how to get a clear title after going to the

---

[3] However, the record shows that Rule 4 summonses with the complaint Levon filed were only sent by certified mail to five heir-defendants, including Rosie. The others were served by publication.

levee board and all of the area to find a map of the town of Concordia. And so I just wanted to be legal by the courts.

So when I filed for the taxes in Rosedale, then after I did that, I found that that -- for heirs to property, you have to have another route where you need a clear title.

And for the clear title, my goal was for the family to have a place to raise nice garden and raise children and educate our children. I've got video on children out there chopping in the garden and learning how to operate in the garden.

So it was not a case to overlook my fellow heirs and brothers and sisters, but there was a problem that my father dealt when they overturned the will and they sold different things. But then they moved away with the mindset and what they told us they would never move back south.

And we laid down our disagreements and our -- whatever odds we had about the way that happened, and we moved on with life, Your Honor. And we thank God for allowing us to be close now.

The chancery court entered a judgment against those non-responding defendants, and set the matter for hearing on April 4, 2018, at which time the court would enter judgment against Rosie unless she had filed a response contesting the complaint.

¶10. On April 11, 2018, Rosie's attorney-in-fact and daughter, Anderson, filed an answer and motion to dismiss Levon's complaint. She claimed that any use of the land by Levon was not exclusive, but permissive, and that any title he purchased at the tax sale constituted a constructive trust for himself and all of Andrew's heirs. She alleged that she received no notice from the chancery clerk of the expiration of the redemption period as required by statute.

6

¶11.    The chancery court held a hearing on the merits on April 2, 2019.  During the hearing, Levon's attorney's secretary, Karen Watson, testified that the first attorney Rosie retained in Illinois called their office, and she heard him say that he had no objection to Levon's obtaining a default judgment against the other heirs.

¶12.    Levon testified that he had grown up on the land and helped his father farm it.  He said that at the time of his father's death, he was in college.[4]  After Andrew's will was rejected, Levon said that the family denied him because he was illegitimate and put his mother out of the house. The family rift lasted for several years.  Levon testified that in 1985 Rosie and her brother James borrowed money against property in Arkansas that belonged to Andrew's estate.  He said they later deeded the property to Emil Erck, without Levon's permission, and that they also sold their father's farm equipment.

¶13.    Levon said that at Frenchy Johnson Jr.'s funeral in 1999, family ties were restored.

Q.    Okay. Now, did y'all bury the hatchet at Frenchy's funeral?

A.    Yes.

Q.    Were there tears involved?

A .    Yes.

Levon testified that he visited Rosie several times thereafter.  During a visit in 2000, he said they discussed the property in Bolivar County.  According to Levon, Rosie told him that she

---

[4] After college, Levon said he worked in industry and politics.  Over the years, he had served on the school board, on the board of alderman for Gunnison, Mississippi, as constable, and as mayor of Pace, Mississippi.

was not coming back to Mississippi, and

> she gave me the paper for the tax, and she said she wanted me to have the property, but she also had a [stipulation]. She said take care of Momma and Poppa's grave. That was always take care of their graves. That is what she said to me. And that was -- I agreed to take care of those graves.

Upon his return to Mississippi, Levon notified the tax assessor's office, and thereafter he received tax notices and paid the property taxes. As noted above, the tax rolls were then changed and listed the property as owned by "Lawson Andrew in care of Levon Jackson."

¶14. After his conversation with Rosie, Levon went onto the land, which had grown over. He testified that the graves of his father and Rosie's mother that he had said he would protect were located in the middle of the property. He saw that others would come on to the property to try to farm around it, and he wanted to make sure that they were not able to claim the land by using it. But he did not testify to any actions he took to dissuade others from doing so, only that he went to speak to an attorney.

¶15. Although Levon had previously testified on March 7, 2018, that he had farmed the land for twenty-five years after his father's death, at the April 2, 2019 hearing, he changed his testimony concerning his farming efforts:

> Q. Okay. After you had the conversation with Rosie, did you farm the land?
>
> A. No, sir.
>
> Q. Okay.
>
> A. I farmed it as I grew up as a child all my life as a child until I went off to college.

8

Levon further testified that "in 1979 was the last crop I farmed." He also said that even now (in 2019) the vegetation had grown up, and it would be another six years before he would be able to farm it.

¶16. Levon also said that after his conversation with Rosie, he went on the land and found that others were farming it:

> A. Okay. I had attempted to take care of the graves and have been taking care of the graves, and my goal was to complete that. But when I attempted to do that, I found out that the farmers was farming over on the land. And by the farmers farming over on the land, I learned in the state of Mississippi -- state of Mississippi and Arkansas, if someone farming the land, whether you paying the taxes or not, it becomes their land. So the important part was to preserve the land. And I began to talk to different attorneys who told me different things. And my goal was to preserve, preserve, preserve. So to preserve, I had to go and find out all the information . . . about what I had to do and pay to get the land preserved before we lose it and wouldn't have anything.

¶17. Levon testified that he visited Rosie in Illinois several times after their 2000 conversation at her home, at her assisted living facility, and at the nursing home where she resided at the time of the trial. He said that he would report that he was taking care of the gravesites as promised. When asked what he told other family members about his intention to acquire the property for himself, Levon said he told them the following:

> A. That we was about to -- the land was going to be lost and I wanted to try to retrieve the land.
>
> Q. But you never told him you were claiming the land.
>
> A. I wanted to retrieve the land.

However, Levon admitted he never had any direct communication with the heirs other than

9

Rosie:

> Q.   My question to you is, did you personally have written communications with any of the defendants in this lawsuit other than Ms. Rosie or Ms. Rosie's daughter?

> A.   No.  Personally, no, sir.

But Levon did say he talked with Frenchy's brother, William (Frenchy) Johnson, in Decatur, Illinois, and to some of James's children who all said they were moving to Texas and not coming back to Mississippi.  Specifically, Levon testified:

> I met with Frenchy Johnson in Decatur, Illinois, and I advised Frenchy [that we were] about to lose the land.  And he asked me, said, what are you talking about? I said, well, the farmers already encroaching on the land and we can't get them off.  He said, well, I'm not coming back to Mississippi. I don't really -- they was down for a family reunion. But he said, I don't really remember where it is at. That was a conversation with one of the family member.

> . . . .

> A.   That we was about to -- the land was going to be lost and I wanted to try to retrieve the land.

> BY MR. JONES:

> Q.   But you never told him you were claiming the land.

> A.   I wanted to retrieve the land.

Levon said he also spoke to Richard Lawson in July 2000:

> A.   I advised him of the -- I was inquiring of the property and asked him what did he think about it, and I asked him could he get some of his sisters' phone number(s), because they lived in Texas and Decatur.

> Q.   Okay. I'm a little confused, Reverend Jackson. You say you talked to him and told him you were acquiring some property. Is that what you

10

are saying?

A.     I am usually hit with a question saying what are y'all doing with that property down there, and that is what my response would be, that I am looking at acquiring the property because we are going to lose the property.

Q.     So you are telling me that you talked -- let me-- I want to make sure I got you right. It is your testimony that you told Richard Lawson that you were acquiring this property.

A.     Yes, sir.

Q.     And he told you what?

A.     His question was before my question. They always ask me what are you going to do with that property down there. And my response is, to any other heir that would ask me that or any other family member -- that we are going to lose it unlessen someone -- in my case, I say I would like to do it, come, you know --

Q.     Said you would like to do it.

A.     At that time. Let's discuss . . .

Q.     Doing it, mean you get the property.

A.     Yes, sir.

¶18.    After buying the land at the tax sale, on September 12, 2014, Levon had the land bulldozed at a cost of $4,200.  On January 23, 2013, he had a survey prepared by an engineer so that the land's boundaries would be clear, costing $3,550.  After the survey, he began a family garden again with the help of his children and grandchildren.  But Levon testified that he did not live on the land and had not lived there since his father's death.

¶19.    Anderson, as attorney-in-fact for her mother Rosie, also testified.  She said that Rosie

was ninety years old, suffered from dementia, and was unable to identify anyone speaking to her. Rosie's mental health started to deteriorate in 2002, and Anderson moved her into an assisted living facility at that time, where she stayed until 2006. Since then, Rosie had been living in a nursing home. Anderson obtained a power of attorney for her mother in 2004, and Anderson said she alerted the whole family of her mother's health issues when her mother was moved to the assisted living facility. She recalled Levon visiting her mother at her mother's home only once. Anderson said that to her personal knowledge, Rosie expected Levon to be taking care of the property, and he never claimed to be the sole owner. Anderson said Levon knew where her mother was because she texted him about her condition several times. Anderson also told him when she had become her mother's attorney-in-fact. The first time she learned of Levon's claim to the land was when her mother received a packet of information from the court at her nursing home address. Neither she nor her mother received any notice of the delinquent taxes.

¶20. After considering post-hearing briefs of the parties, the chancery court held that Rosie did not have standing to set aside the judgment entered against the other heir-defendants and that summons by publication was sufficient to establish the court's jurisdiction over those defendants. The chancery court also found that Levon had met the legal requirements to establish title by adverse possession prior to the time of the tax sale in 2012. Thus, the court held, his purchase of the property at the tax sale was not for the benefit of any cotenant. The chancery court further reasoned that although he was an heir and cotenant with Andrew's

12

other heirs, Levon had adversely possessed the property against them because the court found no confidential relationship existed between Jackson and the other heirs. The chancery court noted that the other heirs had disavowed Levon because he was an illegitimate child. He was not mentioned as a family member in the several obituaries entered as evidence. This continued until 1999 when some reconciliation took place between Rosie and Levon. Levon took over payment of the taxes, and Anderson did nothing to inquire about the status of the property on the part of her mother, Rosie. The chancery court found that Rosie's oral conveyance of the property to Levon was a time marker to begin his period to acquire the property by adverse possession. Unlike Rosie, who had previously paid the taxes, the chancery court found that Levon "flew his flag over the property" to give notice to other cotenants and the world that he was the sole owner and possessor of the property. The chancery court found, "Jackson was treated as a stranger and as such had the right to act as a stranger. It is a manifest injustice to require that Jackson make financial, physical and economic sacrifices for cotenants that denied his very existence."

¶21. The chancery court further held that Rosie was prevented from challenging Levon's acquisition of the property because of her own unclean hands. The chancery court based this on Rosie's alleged actions in the administration of Andrew Lawson's estate. From those court files, the chancery court listed the property in the estate including the house, land, hogs, trailers, a tractor, a cotton picker, vehicles, a TV, a watch, and a ring. The chancery court found that Rosie and her brother James Lawson had been appointed co-administrators but

13

failed to fulfill their duties "to complete the case" (distribute the assets to the heirs, do a final accounting, and close the estate), which "created the space for [Levon] to oust the other cotenants." The chancery court found that "Rosie and James Lawson plundered and looted Andrew's estate," finding, "[W]hen the [c]ourt looks at all that has been lost by Jackson due to Rosie willfully holding open the Andrew Lawson Estate while she plundered and looted it clean, equity requires that he receives some small measure of justice."

¶22. Anderson, on behalf of Rosie, appealed from the chancery court's judgment.[5] She challenges (1) the chancery court's finding that Levon obtained title by adverse possession, (2) the chancery court's ruling on the validity of Levon's tax title, and (3) the chancery court's jurisdiction over the non-resident heirs who received only notice by publication. In response, Levon argues that Anderson had no standing to challenge the default judgment against the other heir defendants, that Anderson was estopped by unclean hands and laches from claiming an interest in the land, and that the evidence supports the chancellor's finding that Levon acquired title by adverse possession.

**Standard of Review**

¶23. "This Court has a limited standard of review in examining and considering the decisions of a chancellor." *Frazier v. Frazier*, 31 So. 3d 1218, 1219 (¶4) (Miss. Ct. App. 2009) (quoting *Ellison v. Meek*, 820 So. 2d 730, 734 (¶11) (Miss. Ct. App. 2002)). "A finding that the proof was sufficient to sustain a claim of adverse possession is a fact-finding

---

[5] Charles was later substituted in as a party on appeal.

14

that requires our application of the substantial-evidence/manifest-error test." *Presley v. Stokes*, 290 So. 3d 763, 765 (¶6) (Miss. Ct. App. 2020); *Powell v. Meyer*, 203 So. 3d 648, 652 (¶16) (Miss. Ct. App. 2016). "When reviewing a chancellor's decision, we will accept a chancellor's findings of fact as long as the evidence in the record reasonably supports those findings. In other words, we will not disturb the findings of a chancellor unless those findings are clearly erroneous or an erroneous legal standard was applied." *Frazier*, 31 So 3d at 1219-20 (¶4).

## Discussion

**I.    Whether the trial court erred in finding that Levon acquired sole title and ownership of the subject property by adverse possession.**

¶24.    The chancery court found that Levon had obtained title by adverse possession prior to his purchase of the property at the 2012 tax sale. The court determined that Rosie's 2000 conversation with Levon was the marker for the beginning of the period of adverse possession. Thus, we examine Levon's proof of activity from 2000 to 2012 to determine if it supports his claim of adverse possession.

¶25.    Under Mississippi Code Annotated section 15-1-13(1) (Rev. 2019),[6] a party may claim

_____

[6] Section 15-1-13 provides:

(1) Ten (10) years' actual adverse possession by any person claiming to be the owner for that time of any land, uninterruptedly continued for ten (10) years by occupancy, descent, conveyance, or otherwise, in whatever way such occupancy may have commenced or continued, shall vest in every actual occupant or possessor of such land a full and complete title, saving to persons under the disability of minority or unsoundness of mind the right to sue within

15

title to property after ten years' actual adverse possession. To establish a claim of adverse possession, Levon must show that his possession was "(1) under claim of ownership; (2) actual or hostile; (3) open, notorious, and visible; (4) continuous and uninterrupted for a period of ten years; (5) exclusive; and (6) peaceful." *Frazier*, 31 So. 3d at 1220 (¶6) (quoting *West v. Brewer*, 579 So. 2d 1261, 1262 (Miss.1991)). The burden is on the one claiming title by adverse possession to prove each element by clear and convincing evidence. *Orcutt v. Chambliss*, 243 So. 3d 757, 762 (¶15) (Miss. Ct. App. 2018). "Clear and convincing evidence is such a high standard of proof that even the overwhelming weight of the evidence does not rise to the same level." *O'Neal v. Blalock*, 220 So. 3d 234, 240 (¶13) (Miss. Ct. App. 2017). Proof of the elements of adverse possession can overlap. *Edwards v. Williams*, 292 So. 3d 586, 593 n.4 (Miss. Ct. App. 2019).

¶26. Significantly, in this case Levon claims ownership by adverse possession against co-heirs of Andrew Lawson and cotenants of the property. "If the party is claiming land possessed by a cotenant, the party claiming the land by adverse possession must also prove ouster." *Frazier*, 31 So. 3d at 1220 (¶7); *Williams v. Est. of Williams*, 952 So. 2d 950, 953 (¶8) (Miss. Ct. App. 2006).

### A. Claim of Ownership

¶27. "When determining whether an adverse possessor has staked a proper claim of

---

ten (10) years after the removal of such disability, as provided in Section 15-1-7. However, the saving in favor of persons under disability of unsoundness of mind shall never extend longer than thirty-one (31) years.

16

ownership, the relevant inquiry is whether the possessory acts relied upon by the would-be adverse possessor are sufficient to fly his flag over the lands and to put the record title holder on notice that the lands are held under an adverse claim of ownership." *O'Neal v. Blalock*, 220 So. 3d 234, 240 (¶14) (Miss. Ct. App. 2017). A claim of ownership can be supported by one with "color of title." Color of title is an instrument of conveyance or a record which appears to convey title but which in fact does not have that legal effect. *Roberts v. Young's Creek Inv. Inc.*, 118 So. 3d 665, 672 (¶18) (Miss. Ct. App. 2013) (citing *Houston v. U.S. Gypsum Co.*, 652 F. 2d 467, 473-74 (5th Cir. 1981)). An adverse possessor may claim under the color of title of a defective or imperfect instrument, even though his grantor or a predecessor was entirely without title or interest. *Roberts,* 118 So. 3d at (¶18). But color of title is not an element of adverse possession. *Id.* at (¶19). "Simply put, it is the fact of adverse possession and the claim of ownership for the statutory period that confers title." *Crotwell v. T & W Homes*, 318 So. 3d 1117, 1123 (¶21) (Miss. 2021).

¶28.    Because he had no instrument such as a purported deed to begin the period of adverse possession, Levon points to Rosie's alleged statement in 2000 that he could have the property and her actions in giving him the tax documents.[7] While this may constitute the basis for a claim of ownership against Rosie for her heirs' share in the property, Levon showed no basis for this to establish a claim of ownership against the other heirs. Simply being named as an

_____

[7] Levon's tax title cannot be used as proof for claim of ownership because it was acquired in 2014, less than ten years from when he filed suit in 2018.

heir does not support a claim of sole ownership if there are other heirs as well. Although he testified that he told Walter Johnson and Richard Lawson of his desire to "retrieve the land," his comments were made in response to their inquiries to him about the status of the land to which he replied that he wanted to retrieve or acquire it to keep it from being lost to others. He sent no written communication to any of the heirs indicating his intent to take full ownership of the land. Nor did the 2014 tax title constitute a claim of ownership for adverse possession purposes. Even the chancery court recognized that the period of adverse possession preceded the tax title. Thus, there is no evidence that Levon had any "color or title" to support a claim of ownership against the other Lawson heirs. This then leaves only his acts of adverse possession, which we proceed to examine and find insufficient to establish a claim of ownership as well.

### B. Actual or Hostile

¶29. "The actual or hostile occupation of land necessary to constitute adverse possession requires a corporeal occupation, accompanied by a manifest intention to hold and continue to hold the property against the claim of all other persons, and adverse to the rights of the true owner." *Cronier v. ALR Partners L.P.*, 248 So. 3d 861, 868-69 (¶22) (Miss. Ct. App. 2017) (internal quotation marks and citations omitted). For example, farming land for twenty years, granting hunting leases, and flagging the property line is hostile use. *Anderson v. Fisher*, 296 So. 3d 124, 130-31 (¶17) (Miss. Ct. App. 2019); *see also Revette v. Ferguson*, 271 So. 3d 702, 708 (¶13) (Miss. Ct. App. 2018) (Testimony was sufficient to establish hostile use was

18

shown by the adverse possessor who believed his purchase of his land included the disputed parcel; his family ran cattle, rode horses, hunted, fished, camped, planted grass on the disputed property; and they leased the parcel to a hunting club which put up deer stands and posted "no trespassing" signs that were visible from 300 to 400 feet.).

¶30.    Ultimately, the question is whether the possessory acts of the claimant are sufficient to put the record title holder on notice that the property is held under an adverse claim of ownership. *Orcutt v. Chambliss*, 243 So. 3d 757, 762 (¶15) (Miss. Ct. App. 2018); *Hill v. Johnson*, 27 So. 3d 426, 431 (¶23) (Miss. Ct. App. 2009).  Moreover, in *Cronier*, we held that the adverse possessor must prove that other owners were "aware of their occupation and took no action to prevent it." *Cronier*, 243 So. 3d at 869 (¶25) (citing *Double J Farmlands Inc. v. Paradise Baptist Church*, 999 So. 2d 826, 829 (¶15) (Miss. 2008)).  In *Orcutt*, we agreed with the chancery court that the evidence in that case was not clear and convincing on the element of adverse and hostile use. *Orcutt,*  243 So. 3d. at 763 (¶21).  We explained that although Orcutt testified about someone else running off trespassers, there was no testimony that the property was posted in any way to warn others that they were trespassing. *Id*.  We pointed out that the chancellor had correctly noted that "there was very little evidence of any acts to control the use of the subject property. There was no testimony, for example, of any fencing of the property and/or locking of gates by Mr. Orcutt or on his behalf." *Id.*

¶31.    In this case, Anderson testified that Levon gave her mother, Rosie, no actual notice of his intent to adversely possess the land against her and the other heirs.  Although Levon

19

spent considerable time compiling the list of heirs and their addresses, there is no testimony that he gave any of them actual notice of his intent to claim the land for himself, only of his intent to retrieve the land so that others could not claim it. The only individuals he spoke to were Robert Lawson and William (Frenchy) Johnson. However, Robert Lawson is not listed as an heir in the seven pages of Levon's complaint where Andrew Lawson's heirs are identified.

¶32.    Moreover, Levon's activity on the land must be of such quality to put his co-heirs on notice. "The polestar question is whether the possessory acts by the adverse possessor sufficiently put the record title holder on notice that the property is held under an adverse ownership claim." *McLendon v. Copiah Forest Prod. Inc.*, 926 So. 2d 260, 263 (¶4) (Miss. Ct. App. 2006). Here, Levon's actions between 2000 and 2010 consisted simply of tending to the graves on the property and paying the taxes. Although "payment of taxes is a public and visible action demonstrating to others that the adverse possessor is claiming responsibility for the property and assuming an economic burden," *Edwards v. Williams*, 292 So. 3d 586, 593 (¶44) (Miss. Ct. App. 2019), in this case, Levon's payment of the taxes was no different from Rosie's paying them from 1978 through 2000. In addition, the only activity on the land itself that Levon undertook between 2000 and 2010 was tending to his father and Rosie's mother's graves. The bulldozing work and the survey occurred in 2013 and 2014, after Levon bought the property at the tax sale, which the chancery court said occurred after his title by adverse possession had ripened. Levon did not begin the family garden until after

the survey in 2013. He testified during the trial that he did not farm the land after his father died in 1978. On the record before us, Levon's actions were insufficient to let the Lawson heirs know of his adverse possession claim, and the chancery court's findings were manifestly in error.

### C. Open, Notorious, and Visible

¶33. "In addition to the requirements that possession be under a claim of ownership and hostile, possession must also be open, notorious, and visible." *Revette v. Ferguson*, 271 So. 3d 702, 709 (¶19) (Miss. Ct. App. 2018). For example, in *Collins v. Moore Family Trust, 1999*, 269 So. 3d 184, 190-91 (¶24) (Miss. Ct. App. 2018), we affirmed a chancellor who found that an adverse possessor's unrestrictive use of land from 1911 to 2016, which included farming, bushhogging, raising cattle on the parcel, and maintaining both the fence and the fenced-in parcel, was open, notorious, and visible even though the use was not daily. Here Levon's tending to graves on the fourteen-acre property and his payment of taxes were the only open and visible actions he took during the relevant ten-year period. These actions are not sufficient to establish by clear and convincing evidence the open, notorious, and visible element of adverse possession.

### D. Continuous and Uninterrupted for a Period of Ten Years

¶34. Intermittent use is insufficient to a continuous presence on land. *Presley v. Stokes*, 290 So. 3d 763, 765 (¶15) (Miss. Ct. App. 2020) (intermittent cutting of hay once or twice a year and some grazing by cattle). In this case, Levon tended to the family grave plots

21

between 2000 and 2010 and paid the taxes. There was no evidence to dispute any interruption of these activities, so what limited activities Levon took were continuous and uninterrupted for the ten years in question.

### E. Exclusive

¶35. We have defined exclusive possession as "effective control over a definite area of land, evidenced by things visible to the eye or perceptible to the senses. It includes control over the land and the intent to exclude others except with the occupant's consent." *Winters v. Billings*, 281 So. 3d 75, 81 (¶17) (Miss. Ct. App. 2019). "Exclusive possession is an intention to possess and hold land to the exclusion of, and in opposition to, the claims of all others, and the claimant's conduct must afford an unequivocal indication that he is exercising dominion of a sole owner." *Id*. at 82 (¶21) (internal quotation marks omitted).

¶36. In this case, there was no proof in the record that Levon excluded the use of the property by others. He said when he took over payment of the taxes, others had farmed on the land and he wanted to stop them from claiming the property on that basis. But he did not testify that he took any actions to prohibit them from coming on the property thereafter. He did not fence the property; he did not post "no trespassing" signs on the property; and he did not testify to any conversations with any of these people who may have attempted to come onto the property. Moreover, he did not restrict any heir from its use. In fact, he testified that he wanted to preserve the land for the family's use. Accordingly, the record is insufficient to establish exclusive use by Levon during the relevant period of time.

### F.    Peaceful

¶37.    "An adverse possessor's use of a claimed property must be peaceful." *Collins*, 269 So. 3d at 191 (¶29). When the record reflects no dispute over the subject property, there is sufficient evidence to support the chancellor's determination of possession peaceful. *Id*. In this case, there was no testimony in the record of any dispute over the subject property during the relevant period of claimed adverse possession, and we find sufficient evidence to support a finding of peaceful use.

### G.    Ouster

¶38.    A cotenant may be ousted by the adverse possession of another. *Hurst v. J. M. Griffin & Sons*, 209 Miss. 381, 46 So. 2d 440, 441 (1950). However, "the cotenant alleging ouster has the burden of establishing that the other cotenants were unequivocally ousted by actual notice or conduct equivalent thereto." *Jordon v. Warren*, 602 So. 2d 809, 815 (Miss. 1992). Evidence of acts by a cotenant consistent with cotenancy, such as using the land and paying taxes on it, do not constitute an ouster of the other cotenants. *Campbell v. Dedeaux*, 386 So. 2d 713, 715 (Miss. 1980); *see also Hurst*, 46 So. 2d at 442 (The occupancy of land by cotenant and paying taxes thereon is insufficient to establish his title thereto by adverse possession as against other cotenants.). The Mississippi Supreme Court held that activity of complainant's brother on property of their father from time he came into possession, namely, changing land into pasture, building fences, digging ponds, and straightening a creek, was consistent with cotenancy occupancy and was in no sense notice of adverse possession.

23

*Johnstone v. Johnson*, 248 So. 2d 444, 450 (Miss. 1971).

¶39.    In *Kennedy v. Bryant*, 252 So. 2d 784, 788 (Miss. 1971), the supreme court explained the reason why a cotenant must prove an ouster. The reason for the rule is that a managing cotenant, in attempting to claim interest of other cotenants by adverse possession, has the burden of proving ouster by clear and convincing evidence "since a confidential relationship exists between cotenants, a cotenant who desires to terminate the relationship has the remedy of partition, or sale for division of proceeds in proper cases, and rather than trying to oust his cotenant and claim adversely, he should deal openly and forthrightly with his cotenant and avail himself of such remedy." However, in *Ferguson v. Chancellor*, 206 Miss. 518, 40 So. 2d 275, 278 (1949), the Mississippi Supreme Court held that the confidential relationship rule can be negated with a showing that, although the parties were tenants in common under the law, they were not so in fact, and actually asserted hostile claims against each other.[8] To determine if the confidential relationship among cotenants exists depends on the circumstances of each case. *Bayless v. Alexander*, 245 So. 2d 17, 21 (Miss. 1971).

---

[8] In that case, Angus Ferguson, one of John Ferguson's ten children, claimed property owned by his father to the exclusion of the interests of his brothers and sisters. *Id*. at 276. For fifty-two years after he purchased it at a tax sale, Angus openly and exclusively used the land with no challenge to his use. *Id*. He built a house on the property and when it burned he immediately rebuilt it on the same spot. *Id*. at 277. He cultivated part of the land, fenced it, sold timber, and leased portions of it. *Id*. Angus then deeded the property to his daughter who later sued to confirm her title. *Id*. As part of her evidence, the daughter provided testimony from disinterested persons that Angus's claim was "recognized by general reputation in the neighborhood, and acknowledged among all of the members of the family." *Id*. The supreme court held that in this case the presumption of a confidential relationship among cotenants rule had been overcome.

¶40. Moreover, although a cotenant may be ousted by the adverse possession of another, it must be with actual notice to such cotenants or "shown by such acts of repudiation of their claim [to land] as are equivalent to actual notice" in order to establish title by adverse possession. *Hurst*, 46 So. 2d at 442. "The possessing cotenant must show actual notice to his cotenant or that which is vaguely expressed by 'acts equivalent thereto, as by conduct so unequivocal that knowledge on the part of the cotenant out of possession must be necessarily presumed.'" *Johnstone*, 248 So. 2d at 448.

¶41. In this case, as an established heir of Andrew Lawson, Levon was clearly a co-owner with Andrew's other heirs of the Bolivar County property at issue. It appears from the record that no one occupied the property, which was primarily woodland, after Andrew's 1977 death and the subsequent eviction of Levon's mother from the home. As co-heirs, Levon, Rosie, and the other heirs owned the property as cotenants. As the supreme court explained in *Quates v. Griffin*, 239 So. 2d 803, 809 (Miss. 1970), "this Court is committed to the rule that the relation of a cotenant, not a stranger to the title, to the other cotenants is that of a fiduciary. This leads to the presumption of law that the acts of a cotenant in possession are for the benefit of, and not contrary to, the interests of cotenants out of possession."[9]

---

[9] In *Quates*, the supreme court noted:

Griffin's possession for approximately thirty years can only be characterized as including every act of ownership that would normally be practiced by an actual owner on rural lands of this character. It included the payment of taxes, the improvement of the pasture, the repair of the houses, the repair and removal of fences, the cutting of timber for the construction of a pond, the

25

¶42. The chancery court held that Levon's case was an exception to the presumed confidential relationship among heirs. The chancery court reasoned that Levon had been denied by other heirs at the time of his father's death and was not listed as a relative in subsequent family members' obituaries. The chancery court found that because Levon was treated as a stranger, he had the right to act as a stranger. But how Levon was treated by family prior to 1999 when he himself admitted that the family reconciled did not change his legal status as co-heir and cotenant of the property with them before and after. Levon did not testify to any continuing family animosity after Frenchy Johnson Jr.'s funeral, and the court itself noted the reconciliation with at least Rosie. After 2000, Anderson testified that she contacted Levon on several occasions to update him on Rosie's health and to let him know that Rosie had made Anderson her attorney-in-fact. Even Levon testified that family members would ask him about the status of the property. These facts show a continuing family relation and support the existence of a confidential relationship between Levon and the other heirs. Moreover, there were no disputes over the property, as in *Ferguson*, to show

> construction of the pond, the grazing of cattle upon the land and maintaining tenants on the property. However, these acts are also those which are entirely consistent with the lawful acts of possession which may be exercised by a cotenant in possession. In sum, the acts were not inconsistent with a cotenancy. The burden was upon Griffin, if he is to prevail in this suit, to prove an ouster by clear and convincing evidence. This burden of proof is difficult. It has been described as not necessarily implying an act accompanied by force, but nevertheless it is substantial and not easily achieved.

*Quates*, 239 So. 2d at 810 (citation omitted).

26

the lack of a confidential relationship. The proof in the record does not support the chancery court's finding of the lack of confidential relationship among the heirs, certainly not enough to meet the heightened clear-and-convincing evidence standard.

¶43. In this case, the record clearly shows that Levon gave no actual notice to any co-heir or cotenant of his intent to claim the property by adverse possession. If anything, he conveyed to those who asked that others were trying to obtain the property and that he wanted to "retrieve" it. Moreover, his actions though somewhat inflated by the chancery court,[10] were still actions consistent with those of a cotenant. Accordingly, we find that the chancery court findings were manifestly in error and that Levon had not proved the ouster of cotenants that is required for him to adversely possess against them.

¶44. Having examined the proof presented by Levon, we find that Levon failed to prove by clear and convincing evidence sufficient acts between 2000 and 2012 when he purchased the land at tax sale to establish ownership by adverse possession. Thus, we find that the chancery court erred in ruling that Levon's title to the property by adverse possession had ripened prior to the tax sale.

---

[10] The chancery court found that Levon cleared wild land, farmed, increased the overall acreage of the property by having it surveyed, set the property boundaries, stopped adjoining landowners from trespassing, and secured and protected the grave of his father. However, the record shows that the bulldozing was done in 2014 and that at the time of the trial, no farming had begun. There was no testimony that Levon ever farmed between 2000 and 2010 and that he only started a family garden after the tax sale in 2012. Moreover, the survey that may have added acreage and set boundaries was not done until 2013. Neither the survey nor the bulldozing occurred during the time relevant for the claim of adverse possession.

**II.     Whether trial court erred in finding that Levon acquired sole title and ownership of the subject property by tax deed.**

¶45.     Having held that Levon did not have title to the Bolivar County property by adverse possession at the time of the tax sale, we now turn to whether he acquired title by tax deed. The only evidence presented concerning the tax sale was documentary, including the tax title, the notice of forfeiture, and the clerk's affidavit of mailing. Nonetheless, that evidence is sufficient for us to rule on this issue.

¶46.     "A landowner whose land is sold for taxes may redeem the property by paying the delinquent taxes, along with statutory damages and interest, within two years after the date of the tax sale." *Panola Cnty. Tax Assessor v. Oak Inv. Co.*, 297 So. 3d 1122, 1130 (¶35) (Miss. Ct. App. 2020) (citation omitted). The chancery clerk is required to notify the landowner of the expiration date of the two-year redemption period. *Id.*

¶47.     Mississippi Code Annotated section 27-43-1 (Rev. 2017) provides the form of the notice of forfeiture and the procedure for its issuance:

> The clerk of the chancery court shall, within one hundred eighty (180) days and not less than sixty (60) days prior to the expiration of the time of redemption with respect to land sold, either to individuals or to the state, be required to issue notice to the record owner of the land sold as of one hundred eighty (180) days prior to the expiration of the time of redemption, in effect following, to wit:
>
> "State of Mississippi,
>
> To _____,
>
> County of _____

28

You will take notice that _____ (here describe lands) _____ lands assessed to you or supposed to be owned by you, was, on the ___ day of _____ sold to _____ for the taxes of _____ year _____, and that the title to said land will become absolute in _____ unless redemption from said tax sale be made on or before ___ day of _____.

This ___ day of _____ 20___

_____ Clerk."

Mississippi Code Annotated 27-43-3 further provides:

Should the clerk inadvertently fail to send notice as prescribed in this section, then the sale shall be void and the clerk shall not be liable to the purchaser or owner upon refund of all purchase money paid.

¶48. In this case, the record contains the "Notice of Forfeiture to Land Owners" that the chancery clerk sent. The notice was issued by Bennett N. Haynes and Teddra Turner, D.C., but the document was not signed by either person. Moreover, its issuance date was incomplete showing only "this the 1st day of November, 20__," with no year indicated. Finally, it did not bear the seal of the chancery clerk.

¶49. We have previously held that deficiencies in the notice of forfeiture voids the tax sale. In *Outlaw v. O'Callaghan*, No. 2019-CA-00318-COA, 2021 WL 1185903, at *5 (¶14) (Miss. Ct. App. Mar. 30, 2021), *reh'g denied* (Mar. 30, 2021), the notice of forfeiture sent by the clerk lacked a signature by the chancery clerk or her deputy and lacked the clerk's seal. The notice entered into the record there was similar to the one in this case. It contained a return address for the clerk's office, the end of the notice bore the printed names of the clerk and the deputy clerk, but it had no signatures or seal. *Id.* We held that the blanks in the statute

29

were obviously meant to have signatures.  *Id*. at (¶15). We cited our previous holding in *Orcutt v. Chambliss*, 243 So. 3d 757, 761 (¶13) (Miss. Ct. App. 2018), where we found that a notice of forfeiture did not contain the chancery clerk's signature, "as required."  *Outlaw*, at \*5 (¶16).  We confirmed that our holding in *Orcutt* was not dicta:  "nor do we find that the omission of a signature to be a mere clerical error. As the chancery court noted, without the clerk's signature, the notice provides no obvious clue that it is an official document."  *Id*.

> Precedent requires the notice statutes to be strictly construed in favor of the landowners, and any deviation from the statutorily mandated procedure renders the sale void."  *Panola Cnty. Tax Assessor*, 297 So. 3d at 1131 (¶40) (emphasis added) (internal quotation marks omitted) (quoting *Cleveland v. Deutche Bank Nat. Tr. Co.*, 207 So. 3d 710, 715 (¶20) (Miss. Ct. App. 2016)).  Construing the statute in favor of O'Callaghan, we affirm the court's finding that the lack of the clerk's signature rendered the notice fatally flawed.

*Id*. at (¶17).

¶50.    Likewise, the notice of forfeiture issued in this case was fatally flawed, being incompletely dated, unsigned, and unsealed.  Accordingly, the tax sale was void as is the tax title issued to Levon.  Consequently, Levon did not obtain ownership to the Bolivar County property by tax deed.

### III.    Whether Rosie was estopped from challenging Levon's claims by the doctrine of "unclean hands."

¶51.    Levon testified that Rosie and James, the administrators of Andrew's estate, had borrowed against and then lost property in Arkansas that was part of Andrew's estate, and they sold farm equipment from the estate without proper accounting.  Based on this testimony, the chancery court found that Rosie had failed to execute her duties as an

30

administrator and plundered the estate of Andrew Lawson. Because of this breach of duty, the chancery court held that Rosie was barred by the doctrine of "unclean hands" from challenging Levon's claim of adverse possession of the Bolivar County property. Anderson challenges this ruling on appeal.

¶52. "The doctrine of unclean hands provides that he who comes into equity must come with clean hands." *Pruitt v. Payne*, 14 So. 3d 806, 811 (¶13) (Miss. Ct. App. 2009). "In sum, whenever a party seeks to employ the judicial machinery in order to obtain some remedy and that party has violated good faith or some other equitable principle, the doors of the court will be shut against him and the court will refuse to interfere on his behalf, to acknowledge his right, or to award him any remedy." *Id*. at 8 (¶¶11-12).

¶53. However, we have limited the application of this procedural bar. In *Stewart v. Stewart*, 309 So. 3d 44, 71 (¶76) (Miss. Ct. App. 2020), we explained that "the [un]clean-hands doctrine prevents a complaining party from obtaining equitable relief in court when he is guilty of willful misconduct *in the transaction at issue*." (Emphasis added). In *Estate of Nelson v. Nelson*, 266 So. 3d 1008 (Miss. Ct. App. 2018), we reiterated that "the supreme court has further expounded upon the meaning of unclean hands, stating: the meaning of this maxim is to declare that no person as a complaining party can have the aid of a court of equity when his conduct with respect to the transaction in question has been characterized by wilful inequity." *Id*. at 1017 (¶36) (citing *Thigpen v. Kennedy*, 238 So. 2d 744, 746 (Miss. 1970)).

31

¶54. In this adverse possession case filed in 2018, the chancery court based its ruling of Rosie's unclean hands upon its review of a 1978 estate case. Levon testified that Rosie and James had encumbered and then lost twelve acres of estate property in Arkansas. But Levon's adverse possession/tax title action was a completely separate action. He made no allegation of any wrongful act by Rosie in this case. Rosie's alleged wrongful behavior in the estate action had nothing to do with the issues before the court in 2018. Moreover, at the time of the estate action in 1978, Levon was an adult and in college. Administrators Rosie and James were not appointed until 1980, and each was required to post a $10,000 bond. Even if Rosie had wrongfully administered the estate, at no point did Levon contest or challenge her actions as was his right. He did not sue for an accounting, nor did he file a claim on their bond. If anything, Levon should have raised these concerns within a reasonable time of their occurrence, not thirty-five years later in a completely different case. Accordingly, because Rosie's alleged misconduct was not in connection with the action pertaining to Levon's adverse possession/tax title claims, the chancery court's ruling that Rosie's challenge to Levon's claims was barred under the doctrine of "unclean hands" was in error.

### IV. Whether the summons by publication was sufficient to establish personal jurisdiction over the heirs other than Rosie and support the default judgment entered against them.

¶55. The chancery court issued a default judgment in favor of Levon against all heirs other than Rosie. Anderson challenges this default judgment on appeal, contending that Levon had

32

failed to make diligent efforts to identify the whereabouts of the other heirs and notify them of the lawsuit. In response, Levon contends that Rosie lacked standing to raise the issue of service of process on the other heirs, and that the process by publication was properly obtained.

¶56.    Jurisdiction is a question of law, and we review it de novo. *In re Enlarging, Extending & Defining Corp. Limits & Boundaries of City of Biloxi*, 109 So. 3d 529, 537 (¶7) (Miss. 2013) (citing *In re M.I.*, 85 So. 3d 856, 857 (¶6) (Miss. 2012)). "In the absence of proper service of process, the court lacks jurisdiction, so any default judgment that it enters is void." *Villavaso v. S.H. Anthony Inc.*, 309 So. 3d 587, 593-94 (¶19) (Miss. Ct. App. 2020) (quoting *S & M Trucking LLC v. Rogers Oil Co. of Columbia*, 195 So. 3d 217, 221 (¶16) (Miss. Ct. App. 2016)). However, both the Mississippi Supreme Court and this Court have held that one party to a lawsuit does not have standing to challenge whether sufficient service of process had been made on another party to support a default judgment.

¶57.    The Mississippi Supreme Court dealt with the issue in the *City of Biloxi* annexation case. There, the cities of Biloxi and D'Iberville both sought to annex certain areas and filed competing petitions in chancery court. *City of Biloxi*, 109 So. 3d at 536 (¶2). Biloxi was a party to the D'Iberville action and served with process; Harrison County was a party to both and objected. *Id.* The chancery court consolidated the two annexation proceedings and conducted a trial. *Id.* In its appeal of the chancery court's decision to grant the cities each a portion of the disputed area, Biloxi argued that the chancery court lacked jurisdiction

33

because D'Iberville had failed to show proof of proper publication of notice to the public of its petition. *Id*. at 537 (¶8). Among its responses to Biloxi's argument, D'Iberville contended that Biloxi was improperly asserting notice arguments on behalf of third parties, which it did not have standing to do because Biloxi itself was properly served. *Id*. at 539 (¶12). The Mississippi Supreme Court agreed:

> The trial court indisputably had personal jurisdiction over Biloxi, as it was properly served via the process outlined in the statute. Thus, any claim of lack of proof of notice of publication belongs to third-party objectors, those to whom notice by publication is directed. It is improper for Biloxi to raise the rights of third parties. *See In re Enlargement, Extension of Mun. Boundaries of City of Horn Lake*, 822 So. 2d 253 (Miss. 2002). Biloxi lacks standing to make their arguments.

*Id.*

¶58. We cited the *City of Biloxi* case to support our holding of a party's lack of standing to challenge service of process on another person in *BancorpSouth Bank v. Bruce Sweet Potato Inc.*, 296 So. 3d 143, 150 (¶26) (Miss. Ct. App. 2020). In that case, Walter and Jane Pearson purchased property from Richard Bailey. *Id*. at 145 (¶1). The Pearsons later learned that Bruce Sweet Potato Inc. had obtained and enrolled a default judgment against Bailey prior to their purchase of the land. *Id*. The Pearsons filed a complaint in Chickasaw County Circuit Court to remove cloud from their title, arguing that the default judgment Bruce Sweet Potato had obtained against Bailey was void because service of process on Bailey was defective. *Id*. at 146-47 (¶10). Process had been issued to "Richard Bailey, d/b/a CC Farms," "REB Cane Creek Farms, Inc." and "Magnolia Brand Produce, Inc." and served on

34

Bailey who was the registered agent for service of process. *Id.* at 146 (¶7). The Pearsons also sought to intervene in the Calhoun County Circuit Court action in which the default judgment had been entered. *Id.* at 147 (¶18). In that action, Bailey submitted an affidavit saying that he did not answer the complaint because the debt owed to Bruce Sweet Potato was not a personal debt and but a corporate debt of Magnolia Produce. *Id.* at 147 (¶14). The circuit courts in both cases denied the Pearson's motion to intervene and their motion for summary judgment in their action to remove cloud from their title. *Id.* at 147-48 (¶¶12, 18).

¶59. On appeal, Bruce Sweet Potato argued that the Pearsons were not parties to the default action and they had no standing to challenge the sufficiency of process on Bailey. *Id.* at 149 (¶24). We agreed. We said that the United States Supreme Court has held that a "plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Id.* at (¶26) (quoting *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 955 (1984)). After citing *City of Biloxi*, we noted:

> The [Mississippi] [S]upreme [C]ourt has additionally held that where a party fails to properly serve process, "the only party to have standing" to make a motion to dismiss the action based on improper service is "the party upon whom process has been improperly served." *Burleson v. Lathem*, 968 So. 2d 930, 933 (¶11) (Miss. 2007) (citing M.R.C.P. 4(h)); *see also Rains v. Gardner*, 731 So. 2d 1192, 1195 (¶11) (Miss. 1999); *Collom v. Senholtz*, 767 So. 2d 215, 218 (¶9) (Miss. Ct. App. 2000).

*BancorpSouth Bank*, 296 So. 3d at 150 (¶26).

¶60. Pursuant to the holdings in *City of Biloxi* and *Pearson*, Rosie did not have standing to challenge the sufficiency of process on any of the other heirs or the default judgment

35

entered against them for improper service. However our discussion of the default judgment does not end there.

¶61. Because we reverse the chancery court's judgment appealed from and hold that Levon did not adversely possess the property, nor did he obtain title by tax deed, the default judgment entered against the rest of Andrew's heirs is now in conflict with our holding on the merits of Levon's claim. It appears that our state courts have not been faced with this dilemma; however, federal courts have.

¶62. Long ago, the United States Supreme Court held that in such cases the default judgment cannot stand. *Frow v. De La Vega*, 82 U.S. (15 Wall.) 552, 554 (1872). There the plaintiff alleged that eight of thirteen defendants had jointly conspired to defraud him of title to a large tract of land. *Id*. at 553. The lower court entered "a final decree absolute," i.e., a default judgment against one defendant who failed to answer on time. *Id*. The court later tried the case against the remaining defendants who did answer. *Id*. The court found against the complainant and in favor of the remaining defendants on the merits. *Id*. On the appeal from the default judgment, the Supreme Court noted the absurdity that "there might be one decree of the court sustaining the charge of joint fraud committed by the defendants; and another decree disaffirming the said charge, and declaring it to be entirely unfounded, and dismissing the complainant's bill." *Id*. at 554. The Supreme Court reversed, holding that "where a bill makes a joint charge against several defendants . . . a final decree on the merits against the defaulting defendant alone cannot stand." *Id.* The Court noted that "the true

36

mode" of proceeding when a complaint makes joint charges against several parties, and one defaults, is to simply enter the default and "proceed with the cause upon the answers of the other defendants." *Id.*

> But if the suit should be decided against the complainant on the merits, the bill will be dismissed as to all the defendants alike—the defaulter as well as the others. If it be decided in the complainant's favor, he will then be entitled to a final decree against all. But a final decree on the merits against the defaulting defendant alone, pending the continuance of the cause, would be incongruous and illegal.

*Id.*

¶63. Citing *Frow*, a Mississippi federal district court declined to enter a judgment against a defaulting party when the remaining defendants were defending the action. *Willis v. Seminole Furniture LLC*, No. 119-CV-00036-GHD-DAS, 2020 WL 8736325, at *1 (N.D. Miss. Aug. 27, 2020). In that employment discrimination case, a plaintiff filed a motion for default judgment against a party who had not answered. *Id.* The district court, citing *Frow*, directed the Clerk of Court to enter the default but held that "a default judgment is not proper because the remaining Defendants are presently defending this action." *Id.* at *2.

¶64. The Fifth Circuit Court of Appeals addressed the problem as well when it affirmed a district court's refusal to grant a default judgment against an unanswering party when it found no merit to a plaintiff's claim against joint tortfeasors who did answer. In *Lewis v. Lynn*, 236 F.3d 766 (5th Cir. 2001), an inmate filed a 42 U.S.C. § 1983 action against various prison officials. *Id.* at 767. All but two defendants answered and filed a motion for summary judgment. *Id.* The trial court granted summary judgment for the answering defendants. *Id.*

37

The inmate sought a default judgment against the two who had not answered. *Id*. The district court sua sponte determined that the summary judgment granted to the appearing defendants accrued to the benefit of those who did not. *Id*. On appeal, the Fifth Circuit affirmed, saying that a party does not have a right to a default judgment even if the defendant is technically in default. *Id*. It went on to say that where "a defending party establishes that [the] plaintiff has no cause of action[,] this defense generally inures also to the benefit of [the] defaulting [party]." *Id*. at 768. "The policy rationale for this rule is that it would be incongruous and unfair to allow some defendants to prevail, while not providing the same benefit to similarly situated defendants." *Id.*

¶65. A Mississippi federal district court cited *Lewis* in *Buckley v. Epps*, No. 4:09-CV-10-AV, 2012 WL 777327, at *2 (N.D. Miss. 2012), and followed its direction. In that case an inmate had sued several defendants for claims under 42 U.S.C. § 1983. *Buckley*, 2012 WL 777327, at *1. One person named Taleda Marion was served but failed to plead or otherwise defend. *Id*. A clerk's entry of default was entered, but Buckley did not request a default judgment. *Id*. The case proceeded to trial, and the jury entered a verdict in favor of all the defendants. *Id*. Concerned about the clerk's entry of default, the district court proceeded to discuss whether Buckley was entitled to a default judgment. *Id*. at *2. Citing *Lewis*, the district court concluded that "it would be 'incongruous' and 'unfair' to allow some defendants to prevail, while not providing the same benefit to similarly situated defendants." *Id*. The *Buckley* court concluded, "[F]inally, as the jury rejected Buckley's claims against

the other defendants (which are based upon the same sequence of events), it is proper to dismiss Taleda Marion, as well." *Id*. at *3.

¶66.    Although Mississippi state courts have not addressed such situations as found in *Frow*, *Lewis*, or *Buckley*, we find that their holdings are instructive to us in this case. Although Rosie did not have standing to challenge the sufficiency of process on the other heirs, she did seek to vacate the default judgment overall.  We cannot ignore the fact that the default judgment against other heirs is now irreconcilable with our ruling on the merits of Levon's claims.  Allowing the default judgment to stand results in the "absurdity" referred to in *Frow*.  Accordingly, we vacate the default judgment.  The better practice when there are multiple defendants, similarly situated and potentially jointly liable, is for a court to allow the entry of default against an unanswering, properly served party, but to defer on the entry of a default judgment until the merits of the case have been determined**.**

### Conclusion

¶67.    We hereby reverse the chancery court's judgment granting title to Levon because, as discussed above, it was not supported by the evidence in the record and clearly in error. Levon failed to prove the elements required to establish adverse possession by clear and convincing evidence.  In addition, because the tax sale was void due to the flawed notice of redemption, Levon's tax title is also void.  Additionally, the chancery court erroneously applied the doctrine of unclean hands as a bar to Rosie's challenge to Levon's claim.  We further hold that although Rosie did not have standing to challenge the default judgment

39

against other heirs regarding the sufficiency of process, the default judgment is vacated because it is inconsistent with our holding on the merits of Levon's claims. We therefore reverse the judgment appealed from and render judgment to effect our holdings above as to all parties.

¶68. **REVERSED AND RENDERED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR.**